Fabricant, Judith, J.
INTRODUCTION
This declaratory judgment action raises a question of the relative priority of lienholders after modification of a mortgage loan. Before the Court is the defendant’s motion for summary judgment. After hearing, and review of all materials submitted, the Court will enter judgment declaring the rights of the parties.
BACKGROUND
The record before the Court establishes the following facts as undisputed.[1] On July 13, 1989, Gary Sheehan and his wife, Valerie Sheehan, took title as tenants by the entirely to property at 48 Noon Hill Avenue in Norfolk, Massachusetts. On December 15, 2000, the Sheehans mortgaged the property to New Century Mortgage Corp. in the principal amount of $393,600.00. The mortgage instrument includes the following language: “(t]his security instrument secures to Lender (I) the repayment of the Loan, and all of the renewals, extensions and modifications of the Note.” As of July 2002, the interest rate on the loan was 10.750%, and the monthly payment was $3,674.19.
On June 17, 2002, Michael Shea Company, Inc., the plaintiff in this action, recorded an execution against Gary Sheehan only in the amount of $72,301. The execution did not attach the interest of Valerie Sheehan.[2]
On August 26, 2002, New Century Mortgage Corporation assigned the mortgage on the Sheehans’ property to U.S. Bank, N.A., for which Litton Loan Servicing, L.P., the defendant in this action, acts as loan servicer.[3]
*112 The Sheehans defaulted on their obligations under the mortgage. As of the summer of 2004, a principal balance of $390,891.85 remained, along with accumulated interest of $87,660.22, an escrow advance of $19,743.03, and a “corporate advance” of $5,505.78.[4] Litton scheduled a foreclosure sale for July 22, 2004. Before that date, the Sheehans and Litton agreed to a loan modification. On July 21, 2004, upon payment of $10,500 and delivery of a letter of commitment to the modification, Litton postponed the foreclosure sale to August 25, 2004. On or about August 3, 2004, the Sheehans and Litton entered into a Loan Modification Agreement.[5] The agreement capitalized the accumulated interest balance and part of the escrow advance, waived the remainder of the escrow advance, and lowered the interest rate and monthly payments. The result was a new principal balance of $483,552.06, an interest rate of 7%, and a monthly payment of $3,347.11. Litton asked Shea to execute a subordination agreement, but Shea refused. Litton nevertheless proceeded with the modification, and refrained from proceeding with the foreclosure sale.
Shea brought this action on September 9, 2004. It alleged that as a result of the loan modification, it has been “deprived of the equiiy that has accrued in the property and has been deprived of the security represented by its Judicial lien.” Shea’s complaint seeks a declaration that its lien “takes priority over Litton’s mortgage and that [Shea] should have been paid $94,584.81 upon the remortgaging of the property.”
DISCUSSION
Summary judgment should be granted where it appears from the pleadings and evidentiary materials offered that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Somerset Sav. Bank v. Chicago Title Ins. Co., 420 Mass. 422, 426 (1995); Cassesso v. Comm’r of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). Summary judgment is a device "to make possible the prompt disposition of controversies on their merits without a trial, if in essence, there is no real dispute as to the salient facts or if only a question of law is involved.”
If the record so warrants, the Court may enter judgment for the non-moving party even in the absence of a cross motion for that relief. See Charlesbank Apartments, Inc. v. Boston Rent Control Admin., 379 Mass. 635, 636 n.2 (1980).
General Laws c. 183, §63A, governs mortgage revisions with respect to residential property. That statute provides, in pertinent part, as follows:
A mortgagee may, at the request of the owner of the equity of redemption, revise the rate of interest, extend the term of the mortgage or change the amount of the periodic payments of principal or interest, or both, of an existing note and mortgage from said owner which it holds on a one to four family, owner occupied residence located in the commonwealth[6] provided, however, that (i) no additional money shall be loaned or advanced thereon, except. . . (b) for the payment of delinquent principal and interest on the original indebtedness to the extent that the aggregate amount outstanding at any one time when added to the balance due on the original indebtedness shall not exceed the amount originally secured by the mortgage or the sum of the outstanding balance due and three delinquent periodic payments of principal and interest, whichever is greater;... Any revision in the terms of a mortgage pursuant to this section may be made without the consent of the holders of junior encumbrances and without loss of priority and shall not be construed so as to grant to any such holder of ajunior encumbrance rights which, except for said revision, he would not otherwise have.
In any such revision made, subsequent to a notice to the mortgagor of a default in the terms of a mortgage or the commencement of a foreclosure procedure against the mortgagor pursuant to the terms of said mortgage, the amount permitted in clause (i) of the preceding paragraph may be exceeded, for the purpose of curing such default or preventing such foreclosure, without loss of the validity of said mortgage and without loss of the priority thereof for the amount loaned or advanced pursuant to said clause (i). Any amount loaned or advanced in excess of the maximum amount permitted pursuant to said clause (i) shall be recorded as an encumbrance on the real estate securing the mortgage hereby revised which shall be subordinate to all junior encumbrances of record on said real estate at the time any such excess amount has been loaned or advanced, except as to the holder of any such junior encumbrance which has consented, in writing, to be subordinated to said encumbrance and such written consent has been recorded.
This statutory language permits a mortgagee to change the rate of interest, term, and amount of payments, without consent of the junior lien holder. It does not by its terms authorize changes in principal, but it does permit future advances, within specified limitations. Such advances are limited to payment of delinquent principal, and in those instances are limited in amount; the total aggregate amount outstanding may not exceed the sum of the outstanding balance due and three delinquent periodic payments. Thus, a mortgagee may advance to the mortgagor amounts necessary to cure a delinquency, and thereby increase the principal balance by the amount advanced, without consent of ajunior lienholder, but only within the specified limitations. The second paragraph of the statute expands this authorization in instances when the mortgagee has given notice of default. In such instances, the mortgagor may advance more than the amount authorized by the first paragraph without jeopardizing its mortgage, but in the absence of con *113 sent of a junior lienholder, only the amount permitted by the first paragraph has priority over the junior lien.
Here, although no cash actually changed hands from Litton to the Sheehans, the capitalization of the outstanding arrearage in interest and advances was, in effect, an additional loan, or future advance, from U.S. Bank to the Sheehans. The additional loan was for the purpose of curing a default, and was extended after notice of default; it was therefore authorized by the statute, and did not jeopardize the mortgage. The amount of the additional loan, however, exceeded the amount permitted under the first paragraph. Since Litton did not obtain consent from Shea, its priority over Shea extends only as far as permitted by the statute — that is, the amount of the original indebtedness plus three monthly payments. As to amounts beyond that limit, Litton’s mortgage remains effective, but Shea has priority. The unpaid principal balance as of the time of the modification was $390,891.85. Under the terms of the statute, Litton was permitted to retain priority for that amount plus three monthly payments of $3,674.19, for a total of $401,914.42. The new principal amount was $483,552.06, exceeding the statutoiy limit by $81,637.64. Thus, Litton retains priority for the first $401,914.42. As to the next $81,637.64, Shea has priority over Litton.
Litton argues that the modification of its loan did not prejudice Shea, because if it had foreclosed on the property and sold it at auction in the summer of2004, as it threatened, it would have been entitled to the proceeds of the sale in the full amount of the Sheehans’ indebtedness to it, with Shea’s claim limited to any proceeds in excess of that amount. Since the Sheehans’ total indebtedness under the original mortgage, including arrearages, exceeded the newprincipal amount after the modification, and the interest rate and monthly payment were reduced, Litton argues, Shea’s position has improved. Litton cites common-law cases holding that the validity of a mortgage modification depends on whether it prejudices the security of the junior mortgage. See Shane v. Winter Hill Federal Savings and Loan Association, 397 Mass. 479, 485-86 (1986). Litton also invokes the Restatement (Third) of Property, Mortgages, §7.3(c), which allows a mortgagee to “reserve the right in a mortgage to modify the mortgage . . . [and retain] priority even if the modification is materially prejudicial to the holders of junior interests in the real estate ...”
The short answer to these arguments is that the statute has superseded the common-law rule in the instances it governs, and that our legislature has chosen to depart from the Restatement in such instances. Moreover, on the particular facts as presented here, it is not so clear that the modification did not harm Shea. Shea’s execution applies only to Gary Sheehan’s interest in property held under a tenancy by the entirety. As a practical matter, such a lien is of little value, since Shea cannot sell that interest free of Valerie Sheehan’s rights. See Coraccio v. Lowell Five Cents Sav. Bank, 415 Mass. 145, 151 (1993); Peebles v. Minnis, 402 Mass. 282, 283 (1988); Licker v. Gluskin, 265 Mass. 403, 407 (1929). Had Litton proceeded with the foreclosure sale, depending on the value of the property, Shea might have been able to satisfy its lien, at least to the extent of any surplus proceeds over the Sheehans’ debt to Litton. Foreclosure by Litton thus might have benefitted Shea. The Court cannot conclude, on this record, that Shea’s position did not deteriorate as a result of the modification.
Shea is thus entitled to the declaration it seeks with respect to its priority over the amount of the new principal balance beyond $401,914.42. Shea’s complaint seeks a declaration on a second point, that it “should have been paid $94,584.81 upon the remortgaging of the property.” It offers no support for that contention, and none appears, either in the statute or any other authority cited. That aspect of the relief requested will be denied, and a declaration to the contrary will issue.
CONCLUSION AND ORDER
For reasons stated, pursuant to Mass.R.Civ.P. 56(c), summary judgment shall enter in the form of a declaration as follows: The U.S. Bank mortgage on the property of Gary and Valerie Sheehan holds first priority to the extent of the principal amount of $401,914.42. As to the remaining $81,637.64 of the principal amount of the U.S. Bank mortgage, the lien of Michael Shea Co., Inc. has priority. The loan modification agreement between the Sheehans and U.S. Bank did not trigger any right in Michael Shea Co., Inc., to payment from any funds advanced to the Sheehans by U.S. Bank.

The facts set forth are drawn from the parties’ statements pursuant to Superior Court Rule 9A(b)(5), and documents submitted and referenced in those statements.

A title report appended to Shea’s memorandum reflects an additional lien placed on the property on January 23, 2004, by the Collector of Taxes for the Town of Norfolk, in the amount of $2,898.39.

Shea’s Rule 9A(b](5) statement purports to dispute this fact on the ground that “the purported copy of the assignment is of such poor quality that it [is] mostly illegible.” Shea does not identify any contrary evidence. The Court has reviewed the copy of the assignment provided, and finds it sufficiently legible to provide support for Litton’s assertion of fact on this point. In the absence of any identified contrary evidence, the Court takes this fact as established.

These figures derive from a Loss Mitigation Modification Application Request dated August 6, 2004, appended to Litton’s memorandum. The document leaves some uncertainty as to the date of those figures. At argument counsel explained the “corporate advance” as reflecting costs of collection.

The agreement is dated July 28, 2004, but the parties’ signatures are dated August 3, 2004.

Although the record does not directly indicate that the property in issue here is “a one to four family, owner occupied residence,” both sides rely on this statute.